UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| TAMARIN LINDENBERG, individually and as Natural Guardian of her minor children ZTAL and SML | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Civil Action No. 13-2657-JPM-cgc ) |
| JACKSON NATIONAL LIFE INSURANCE COMPANY | ) ) ) ) |
| Defendant | ) |

**ORDER GRANTING-IN-PART AWARD OF ATTORNEYS' FEES, ENFORCING ATTORNEY'S LIEN, AND DISBURSING FUNDS**

Before this Court is Burch, Porter & Johnson, PLLC's ("BPJ") Motion to Award Attorneys' Fees, Enforce Attorney's Lien, and Disburse Funds, filed on January 31, 2020. (ECF No. 256.) Pursuant to the Court's Order on April 13, 2020, the parties' engaged in additional discovery through May 31, 2020. (ECF No. 259.) Tamarin Lindenberg ("Ms. Lindenberg") filed a Response in Opposition on July 31, 2020. (ECF No. 264.) BPJ filed its Reply in Further Support of its Motion on August 14, 2020. (ECF No. 267.) The Court heard arguments on the pending motion on November 18, 2020. (ECF No. 275.)

I. **BACKGROUND**

The Court adopts the Agreed Order entered on January 17, 2020 (ECF No. 252), which summarizes the procedural and factual background in this matter, as well as the parties' positions regarding the dispute over attorney's fees:

> On December 9, 2019, the United States Supreme Court denied Defendant's Petition for Certiorari and thereby affirmed the Judgment previously entered by

this Court in favor of Plaintiff Tamarin Lindenberg in the amount of $3,087,500.00, plus accrued interest. On December 18, 2019, Burch, Porter and Johnson, PLLC filed a Notice of Attorney's Lien in the amount of $369,174.22 (the "Disputed Funds"). Pursuant to the Order entered on December 20, 2019, this amount has been deposited by Defendant Jackson National Life Insurance Company with the Court. The balance of the judgment, $2,766,280.50, has been paid directly to Plaintiff by Defendant.

A dispute exists as to Burch, Porter & Johnson, PLLC's entitlement, if any, to some or all of the Disputed Funds. A summary of the parties' respective positions is provided below:

**Burch, Porter & Johnson, PLLC's Summary of Position**

In July 2013 Burch, Porter & Johnson, PLLC ("BPJ") entered into an initial fee agreement with Tamarin Lindenberg whereby it would be paid $30,000.00 upon the recovery by Ms. Lindenberg, individually, of a $350,000.00 death benefit from her ex-husband's life insurance policy with Jackson National Life Insurance Company ("JNL"). Later in July 2013, BPJ filed suit against JNL on her behalf and in May 2014 the Court ordered JNL to pay the death benefit to Ms. Lindenberg. At that time, she paid BPJ $30,000.00 pursuant to the initial fee agreement.

The parties subsequently agreed that additional legal fees would be due if there were a recovery of statutory and/or common law bad faith damages, although they were unable to reach an agreement on how this additional fee was to be quantified. BPJ ultimately asserted a punitive damages claim on Ms. Lindenberg's behalf -- taking a position contrary to Sixth Circuit precedent and successfully arguing bad faith damages were not the exclusive remedy for an insurer's failure to pay, and further that a recovery of punitive damages would not be duplicative of bad faith damages.

During the five-day trial in December 2014, proof of attorney fees incurred by Ms. Lindenberg was introduced to support her punitive damages claim. After the jury awarded Ms. Lindenberg $3,000,000.00 in punitive damages plus $87,500.00 in statutory damages, the District Court reduced the punitive award to the statutory cap of $700,000.00. Over the course of the next several years, BPJ continued to represent Ms. Lindenberg's interests before the District Court, the Tennessee Supreme Court, the Sixth Circuit Court of Appeals, and the United States Supreme Court. As a result, Tennessee's statutory cap on punitive damages was ultimately declared unconstitutional and the $3,087,500.00 jury verdict restored.

BPJ's attorney's lien in the amount of $369,174.22 reflects much (but not all) of the time spent and contemporaneously recorded and the expenses incurred on Ms. Lindenberg's behalf since recovery of the death benefit in 2014. During this time, BPJ conferred significant benefits on Ms. Lindenberg with her knowledge and

2

consent.   Because the parties were unable to come to an express agreement on the amount of fees to be paid for these services, BPJ now seeks recovery of fees and expenses on a *quantum meruit* basis consistent with Rule 1.5 of the Tennessee Rules of Professional Conduct.

**Plaintiff's Summary of Position**

On July 15, 2013, Ms. Lindenberg and BPJ entered into an engagement letter regarding Ms. Lindenberg's "individual claim against Jackson National Life Insurance Company."  The letter explicitly contemplated "prevail[ing] in court or reaching[ing] a settlement" and agreed to cap the fees at $25,000.  The engagement letter expressly states "the Complaint will allege you are due extra contractual damages and attorneys fees."  At no point does the engagement letter limit the scope of the representation to merely the recovery of the policy, or otherwise differentiate between a policy recovery or a statutory/bad faith recovery.  At the time, Molly Glover was a newly-arrived contract attorney at BPJ and agreed to represent Ms. Lindenberg for a reduced fee in a quasi-*pro bono* capacity.  On July 19, 2013, BPJ filed Ms. Lindenberg's complaint in Shelby County Circuit Court.  Notably, the original complaint—filed pursuant to what BPJ now erroneously calls the "initial fee agreement"—sought recovery not only for the underlying policy, but also for statutory bad faith and common law bad faith claims. (*See* Doc. No. 2-1.)

On January 15, 2014, Ms. Lindenberg sent an email to Attorney Glover clarifying that proceeding to litigation, as opposed to entering into a global settlement of the matter, was still capped at a $25,000 fee total.  Ms. Glover responded that same day that, "[y]es, that was our very generous offer to you."  On May 19, 2014, the Court ordered the underlying policy paid.  (Doc. No. 32.)

Some two months later, on July 14, 2014, under pressure from Ms. Glover, Ms. Lindenberg agreed to a modification to the July 15, 2013, engagement letter.  This modification, drafted by BPJ, allowed for a tiered contingent percentage that would only become operative "[i]n the event the verdict makes no specific award of attorney fees." This modification to the engagement letter made no attempt to differentiate between the policy recovery (which had already occurred) and the bad faith claims, nor did the modification place any minimum required award of attorney's fees in the verdict.  Perhaps realizing this error, months later Ms. Glover specifically declined to seek a jury instruction on attorney's fees— something the Court promptly corrected of its own accord.   The jury's verdict made a specific award of attorney's fees—$30,000.

In light of very clear and unambiguous contractual language, BPJ attempts to rewrite its own contract because it feels some sort of entitlement to a performance bonus.  To be clear, Ms. Lindenberg faced overwhelming pressure from BPJ to settle this case on numerous occasions, but possessed the courage to soldier on.  In spite of its obvious conflict, BPJ continued representing Ms. Lindenberg, making questionable decisions such as failing to ever send Ms. Lindenberg any invoices for their alleged fees, refusing until claiming its lien to even tell her their

3

claimed total due, and attempting to have Jackson National pay the entire judgment into the BPJ trust account as opposed to Ms. Lindenberg.  In short, with 20/20 hindsight, BPJ is attempting to rewrite its own contract, as modified and repeatedly affirmed, because it is unhappy with the bargain it made.

## II. LEGAL STANDARD

The "general rules of contract law also apply to contracts between attorneys and clients." Alexander v. Inman, 903 S.W.2d 686, 694 (Tenn. Ct. App. 1995).  With respect to contract formation, "[t]he meeting of the minds in mutual assent to the terms of a contract has long been regarded by courts as essential to the creation of an enforceable contract."  Roy McAmis Disposal Serv., Inc. v. Hiwassee Sys., Inc., 613 S.W.2d 226, 229 (Tenn. Ct. App. 1979).

When interpreting the contract, "the strong strain of textualism in Tennessee caselaw demonstrates resolve to keep the written words as the lodestar of contract interpretation." Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc., 566 S.W.3d 671, 694 (Tenn. 2019).  Furthermore, "Tennessee courts 'give primacy to the contract terms, because the words are the most reliable indicator—and the best evidence—of the parties' agreement[.]'" Id. (internal citations omitted).  "If the language at issue is ambiguous—that is, if its meaning is uncertain and is susceptible to more than one reasonable interpretation—the ambiguity is generally construed against the drafter of the contract."  White v. Empire Exp., Inc., 395 F.W.3d 696, 714 (Tenn.Ct.App. 2012).  Still, "[i]ndefiniteness regarding an essential element of a contract may prevent the creation of an enforceable contract."  Doe v. HCA Health Servs. Of Tenn., Inc., 46 S.W.3d 191, 196–97 (Tenn. 2001) (internal citations and quotations omitted).

When "it is not clear from the proof that the parties understood alike the meaning and effect of the contract", then "recovery should be upon the quantum meruit, and not upon the terms of the contract."  Cooper & Keys v. Bell, 153 S.W. 844, 846 (Tenn. 1913).  In such an instance, attorneys may "recover the reasonable value of their services."  Alexander v. Inman, 974 S.W.2d 689, 692 (Tenn.1998).  The Tennessee Supreme Court has further "agree[d] that

4

attorneys should not be penalized for innocent snafus, such as an oversight in drafting that might render their fee contracts unenforceable." White v. McBride, 937 S.W.2d 796, 803 (Tenn. 1996). "To do so would be unfair to the lawyer who had otherwise diligently pursued the client's interests, and it would result in a windfall to the client who had benefitted from these services. Thus, a recovery under a theory of *quantum meruit* is warranted in these situations." Id.

*Quantum meruit* is an "equitable substitute for a contract claim pursuant to which a party may recover the reasonable value of goods and services provided to another if the following circumstances are shown:

1) There is no existing, enforceable contract between the parties covering the same subject matter;
2) The party seeking recovery proves that it provided valuable goods or services;
3) The party to be charged received the goods or services;
4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and
5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

Swafford v. Harris, 967 S.W.2d 319, 324 (Tenn. 1998).

### III. ANALYSIS

BPJ's legal argument comes down to equity—that they are entitled to $369,174.22 as a reasonable fee for legal services provided to Ms. Lindenberg from June 2014 to December 2019. (ECF No. 256 at PageID 5275.) BPJ asserts that there was no clear understanding regarding the legal fees that would be paid beyond the original engagement and after the death benefit was collected. (Id. at PageID 5279.) To support this contention, BPJ makes four arguments: 1) The work contemplated by the engagement letter was completed when the death benefit was awarded to Ms. Lindenberg; 2) BPJ is entitled to payment for legal services it provided through trial; 3) BPJ

5

is entitled to the reasonable value of its services for its post-verdict and appellate services; and that 4) the requested fee for legal services is reasonable. Each of these arguments is addressed below:

### A. The Scope of Work Contemplated by the Engagement Letter Extended Through Trial

BPJ sent an engagement letter to Ms. Lindenberg on July 15, 2013, which reflected discussions between attorney Molly Glover ("Ms. Glover") and Ms. Lindenberg regarding a claim against Jackson National Life Insurance ("JNL"). ("Engagement Letter", ECF No. 257-1.) The Engagement Letter does not provide a detailed scope of work, but does provide a billing rate for document review and drafting of the Complaint against JNL. (Id. ¶ 1.) Additionally, it caps BPJ's fees for recovery to be paid to Ms. Lindenberg following the initial $5,000 cap at $25,000, for a sum total of $30,000. (Id. ¶¶ 1–3.) In January 2014, BPJ was engaged in settlement discussions on behalf of Ms. Lindenberg. (See, e.g., ECF No. 264-2.) In conjunction with these discussions, there appeared to be some dispute over the reading of the fees owed as early as January 9, 2014. (ECF No. 264-8.) Emails exchanged contemporaneously during this time period highlight the parties' interpretation of the engagement letter. For example, on January 9, 2014, Ms. Glover relays the initial offer of settlement and explains the fees that would be owed as follows:

> If you settle for their offer, under the terms of our engagement, you will owe us
>
> 1. $5,000 as reflected in paragraph one of the agreement;
> 2. $25,000 as reflected in paragraph three of the agreement; and
> 3. And [*sic*] case expenses, which total $515.79 at this time.
>
> The contingent part of our agreement calls for you to pay $25,000.00 immediately to the firm if the life insurance proceeds are paid to you, individually. Should we recover attorney fees from JN the first $25,000 will be returned to you to offset what you have previously paid. Anything over and above $25,000.00 paid as an attorney fee will go to the firm. The same would be true if a settlement included a designated attorney fee.

ECF No. 264-9 at PageID 5638.

In response to this reading of the engagement letter, Ms. Lindenberg responds on January 15, 2014 with her own interpretation:

> ***If we go forward in litigation, rather than settle, it is still part of the same suit and below agreement.*** I will pay $25,000 at the point the benefit is paid to me, individually. We will seek the repayment of attorney fees in litigation, and no matter the outcome of litigation**, I will not have any other attorney fees due**. Any fees above the $25,000 noted below will be collected from jnl. Should we recover attorney fees from JN the first $25,000 will be returned to me to offset what I have previously paid, in the event the benefits are paid to me, individually. Anything over and above $25,000.00 paid by JNL as an attorney fee will go to the firm.

ECF No. 264-10 at PageID 5642 (emphasis added).

Ms. Glover responds, "**Yes. This was our very generous agreement with you**." (ECF No. 264-10 at PageID 5642 (emphasis added).) Ms. Lindenberg similarly acknowledges the generosity of this agreement. (Id.)

While BPJ continued to engage in negotiations on behalf of Ms. Lindenberg, the case did not settle. (ECF No. 264-7.) On May 19, 2014, this Court entered an Order directing JNL to "disburse life insurance policy benefits to Plaintiff in the amount of $350,000 with interest from January 23, 2013, until the date of payment", while also noting that "Plaintiff's claims for breach of contract and bad faith remain for later disposition." (ECF No. 32 at PageID 250.)

Based on the Engagement Letter and accompanying evidence regarding the dispute, it is clear that BPJ cannot recover under a theory of *quantum meruit* for work done through trial. At the very least, recovery in *quantum meruit* requires that:

> 1) There is no existing, enforceable contract between the parties covering the same subject matter; 2) The party seeking recovery proves that it provided valuable goods or services; 3) The party to be charged received the goods or services; 4) The circumstances indicate that the parties to the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and 5) The circumstances demonstrate that it would be unjust for a party to retain the goods or services without payment.

Swafford, 967 S.W.2d at 324.

The first factor is the most critical in the instant case. For the portion of the litigation through trial, *quantum meruit* cannot apply because there was already an existing and enforceable contract between the parties covering the same subject matter. The Engagement Letter is the "the most reliable indicator—and the best evidence—of the parties' agreement." Individual Healthcare Specialists, Inc., 566 S.W.3d at 694 (internal citations omitted). To the extent there is any ambiguity in the language, this is "generally construed against the drafter of the contract." White, 395 S.W.3d at 714.

Here, the Engagement Letter at the very least envisions BPJ's representation of an "individual claim against Jackson National Life Insurance Company", including a Complaint that "will allege [Ms. Lindenberg] [is] due extra contractual damages and attorney fees." (ECF No. 257-1 at PageID 5304.) The litigation of this "individual claim" and the legal obligations that came with it, did not end when the Court ordered JNL to pay the $350,000 death benefit in May of 2014. Nowhere in the Engagement Letter does it state that the limited-fee basis will only apply until the payment of the death benefit, and nowhere does the limited scope appear. For the same reason, BPJ's assertion that the Ms. Lindenberg's payment of $30,000 upon receiving the death benefit terminated its legal obligations, lacks foundation in the evidence. Contemporaneous emails show that BPJ understood the bargain and service it was providing to Ms. Lindenberg at a time when she was in dire need of legal help (see ECF No. 264-10 at PageID 5642 ("Yes. This was our very generous offer with you.")). This, along with the Engagement Letter, shows that there *was* a meeting of the minds with respect to BPJ's representation of Ms. Lindenberg's claim against JNL that did not dissolve upon payment of the death benefit. Accordingly, the Engagement Letter was applicable and enforceable through trial.

### B. The General Verdict Addendum Does Not Apply Because the Jury Verdict Provides a Line Item for Attorneys' Fees

Next, the Court addresses whether there was any modification or entry of a new agreement that would change the scope of representation or the fee structure envisioned in the Engagement Letter. As early as June 2014, a dispute appeared to arise regarding Ms. Lindenberg's payment obligations in the event that the jury did not specify a line-item attorney fee. In June 20, 2014 Ms. Glover iterated:

> As we discussed yesterday, you are going to submit a proposed formula for payment of a designated attorney fee that we will use in the event the jury doesn't specify how much of their award (assuming there is an award) is for attorney fees.

ECF No. 257-2 at PageID 5312.

In response, Ms. Lindenberg signals some confusion regarding the designated attorney fee. She asks Ms. Glover, "Please see your email to me on 1/15/2014 in which you outline your understanding of our agreement in its entirely [*sic*]. As we discussed last night we will need to discuss it so we are on the same page." (ECF No. 257-2 at PageID 5312.) On June 20, 2014, Ms. Glover details the issue and flags the difference in their understandings of the Engagement Letter and fee-agreement:

> After a 2 hour and 18 min phone conversation yesterday, we agreed the written agreement needs further clarification *regarding a situation where the jury makes a general verdict as opposed to a line item award for attorney fees*. Otherwise, the 'designated attorney fee' can be interpreted as that amount introduced at trial through our expert witness, a practicing attorney in this community. As we discussed, we will not be able to move forward in our representation of you in this matter, if there is a conflict in our respective interpretations of the fee agreement. To avoid this situation, we agreed yesterday you would make a proposal of a formula to specifically address the situation above. If you do not intend to do this, I need to know immediately.
>
> Meanwhile, we will continue to finalize the initial disclosures which are due today. As we discussed yesterday, regardless of whether we may ultimately have to withdraw our representation, we will get those filed.

ECF No. 257-2 at PageID 5311.

9

Following additional email traffic on June 20, 2014, it appears the parties were at an "impasse", and Ms. Glover again laid out the crux of the dispute between the parties and suggested signing a new agreement to address a situation in which a jury verdict did not include a specific attorney fee:

> I've reviewed our emails from January 2014 where we discussed how the offset operates. We never addressed the issue you have now raised. **It is my understanding that you are taking the position that unless the jury makes a specific award of an 'attorney fee', we will not get paid**. To be clear, at trial we will retain an attorney to serve as an expert who will say that the fees and expenses incurred on your behalf were reasonable and necessary. We intend to present our statements that date from the outset of this matter through trial and reflect all time spent on your behalf. The attorney fees (ie the fact that you had to hire an attorney to pursue this) is part of the damages the law says you are entitled to recover from JNL. Any award from the jury against JNL will necessarily include an attorney fee even if there is no line item making a specific award. The same would be true if we settle before trial. The settlement amount would necessarily include an attorney fee.
>
> It is my understanding that where we are now is that you are not in agreement that the designated attorney fee is whatever expert proof we present at trial as to our fees and expenses. You raised concerns about a situation where the attorney fee would eat up the entire award. **At this point, we have parsed the fee agreement to death. I think we need to sign a new agreement that addresses a situation of a general verdict where there has been no specific amount awarded as an attorney fee so there are not further disagreements or misunderstandings**. To that end, I have asked you to submit your proposal which we will consider…

ECF No. 257-2 at PageID 5309 (emphasis added).

The parties' also disputed whether a new agreement would merely be a clarification of the Engagement Letter, or an amendment. (See ECF No. 257-3 at PageID 5317 ("As we have discussed many, many times, we do not want to 'change' the fee agreement. In our conversations, it has become clear that your interpretation of the agreement is different from ours as it relates to the meaning of 'designated' attorney fee.").) Accordingly, BPJ memorialized the following Addendum to the Engagement Letter (the "Addendum"):

> **In the event of a verdict that makes no specific award of attorney fees:** BPJ will be paid the full amount of the attorney fee presented in court if that amount is not greater than 33.3 percent of the total verdict. If the attorney fee

>   presented in court is greater than 33.3% of the total verdict, BPJ will reduce its fee to an amount that equals 33.3% of the total verdict.

ECF No. 257-5 at PageID 5322 (emphasis added).

On July 24, 2014, Ms. Lindenberg accepted these provisions, noting that "we have accepted the below in the spirit of love and friendship that has always permeated our relationship." Id. Accordingly, the Addendum is a valid and enforceable contract negotiated between the two parties and provided the terms of fees as contemplated by the parties.

Although it was a valid and enforceable contract, the operative provision of the Addendum never came into effect. On December 22, 2014, the jury returned a verdict in favor of Ms. Lindenberg. (ECF No. 151 at PageID 2016.) On the verdict form, the jury provided a line item for attorney and legal fees based on "Defendant's bad faith refusal to pay Plaintiff Tamarin Lindenberg under the Policy". (ECF No. 151 at PageID 2016.)

BPJ argues that because "there was no legal basis for doing so, BPJ did not seek a separate award of attorneys' fees to be recovered separately by the law firm, and the jury did not make any such separate award." (ECF No. 256 at PageID 5282.) BPJ asserts that the "jury evaluated the attorneys' fees Ms. Lindenberg had already paid ($30,000) as part of *her* bad faith damages award, just as BPJ had advised Ms. Lindenberg it would." (Id.) BPJ points the Court to the provision of the Addendum in which it would have been entitled to "the full amount of the attorney fee presented in court if that amount [was] not greater than 33.3 percent of the total verdict." (ECF No. 257-5 at PageID 5322.) In doing so, BPJ leaves out the operative portion of the sentence, which stipulates that provision to apply **"[i]n the event of a verdict that makes no specific award of attorney fees"**. (Id. (emphasis added).) The Court will abide by the terms of the Addendum, which only provides the aforementioned language. (Addendum at PageID 5322). The Court will not second-guess what the jury meant to do, and will not rewrite or renegotiate the fee agreement because the award amount was less than the actual per hour cost of

11

the services provided. BPJ is not entitled to additional fees beyond the $30,000 provided as part of the jury verdict on December 22, 2014.

### C. BPJ is Entitled to the Reasonable Value of its Services for its Post-Verdict and Appellate Services

Finally, the Court addresses whether BPJ's post-trial work is encompassed in the Engagement Letter, and whether it is entitled to fees incurred after the jury's verdict in December 2014. Tennessee's Rules of Professional Conduct Rule 1.3, comment 4, provides that "whether the lawyer is obligated to prosecute the appeal for the client depends on the representation the lawyer has agreed to provide to the client." TN R S CT Rule 8, RPC 1.3 (comment 4). BPJ asserts that following the jury verdict, it "spent the next several months litigating whether the punitive damages verdict should be upheld, or whether, as the insurance company claimed, it would be reduced to the statutory limit of $700,000." (ECF No. 256 at PageID 5283.) BPJ further states that "it continued to make clear to Ms. Lindenberg that it expected to be compensated for the post-verdict services, including any eventual appeal, and that absent such an agreement Ms. Lindenberg needed to retain separate appellate counsel." (Id.) Carol Allsup's email to Ms. Lindenberg on June 17, 2015, provides the state of affairs with respect to the litigation and any fee disputes at the time:

> Per Molly:
>
> Topics that need to be discussed include likely scenarios under which JNL would appeal; possible scenarios under which you would wish to appeal a final order and the attorneys' assessment of the likelihood of success on those issues, **a retainer agreement with Burch Porter that would apply to an appeal**, and a decision on whether or not to make any efforts to resolve case in between the period final order is entered and a notice of appeal is due. (30 days).

ECF No. 257-6 at PageID 5326. Similarly, on July 7, 2015, Ms. Glover emphasizes that BPJ's representation post-trial and on appeal was not envisioned in the original Engagement Letter:

> We have only previously discussed appeal in the context of our authority for taking certain legal positions with Judge McCalla. Obviously on numerous

12

> occasion we presented issues for his consideration and supported our position with authority from the sixth circuit court of appeals. We discussed our legal positions at every turn with you**. We have not discussed this firm representing you as appellate counsel[.] [*sic*] Our representation of you ends with the entry of the final order in the trial court, in the absence of a retainer agreement that covers appellate work.** I do not wish you to interpret this as meaning the firm will not continue to represent you but we have to be on the same page as to how to proceed and what fees we will be paid for appellate work.

ECF No. 264-17 at PageID 5719 (emphasis added).

Furthermore, the fact that BPJ had already brought up this dispute before the December 2014 jury verdict and that parties agreed to the Addendum is additional evidence that continued pro bono legal services were not envisioned by BPJ. Because there was no meeting of the minds with respect to legal services beyond the jury verdict, there was no operative contract in place after the jury ruled for Ms. Lindenberg on December 22, 2014. By June 2015, BPJ had repeated its position that post-verdict services were not envisioned in the Engagement Letter (see, e.g., ECF No. 256-6), which was directed at Ms. Lindenberg's "individual claim against Jackson National Life Insurance Company", not defense of such a claim through appeal or certification of constitutional questions. (See ECF No. 257-1.)

      Despite the obvious tension over being paid for past, present, and future services rendered, BPJ continued to zealously represent Ms. Lindenberg in the case. Ms. Lindenberg in fact retained separate counsel to advise her on the fee dispute. That counsel sent a letter dated October 1, 2015, providing an "opinion" regarding the firm's obligations to represent Ms. Lindenberg through appeal, and further asked BPJ not to discuss the fees issue with Ms. Lindenberg. (ECF No. 264-20 at PageID 5742.) Nonetheless, BPJ continued to work on Ms. Lindenberg's behalf. On November 24, 2015, this Court entered an Order Denying Defendant's Motion for Judgment as a Matter of Law and Granting Plaintiff's Motion for Certification of Questions to the Tennessee Supreme Court. (ECF No. 187.) Following the Tennessee Supreme Court's Order declining to rule on the constitutionality of the punitive damages caps (ECF No. 209-1), this Court entered a Judgment in

favor of Ms. Lindenberg, but limited the punitive damages to the statutory cap of $700,000 (ECF No. 211).

Despite the ongoing fee dispute and any accompanying tension between the parties, BPJ "argued all issues on appeal, including asserting that the full punitive damages award should be reinstated because Tennessee's statutory cap on punitive damages was unconstitutional." (ECF No. 256 at PageID 5284.) On May 3, 2018, BPJ argued its position on behalf of Ms. Lindenberg, and on December 21, 2018, the Sixth Circuit issued an order adopting that position, "holding that the statutory cap on punitive damages, T.C.A. §29-39-104, is unconstitutional." (ECF No. 231 at PageID 5145.) BPJ also successfully defended this decision in the Supreme Court of the United States, which declined to grant *certiorari* to JNL on the issue of the constitutionality of the statutory cap. (ECF No. 245.) Because there was an ongoing dispute and no meeting of the minds with respect to all work done after the jury verdict on December 22, 2014, BPJ is entitled to recover a reasonable fee for services rendered in *quantum meruit*. As noted by BPJ, the firm "not only represented Ms. Lindenberg through a jury verdict, but continued at her insistence to represent her through post-trial motions and multiple complex appellate issues." (ECF No. 256 at PageID 5284.) BPJ asserts that not granting a reasonable fee in *quantum meruit* would result in an unjust windfall to Ms. Lindenberg, who benefited greatly from these services. The Court agrees. Accordingly, BPJ is granted attorneys fees for their work following the jury verdict on December 22, 2014.

### D. Any Allegations of Unethical Conduct or Violations of Professional Conduct are Unfounded

Finally, the Court briefly addresses Ms. Lindenberg's assertion that BPJ has "forfeited its right to an attorneys' lien due to its improper and unethical conduct." (ECF No. 264 at PageID 5502.) Ms. Lindenberg baselessly asserts that "[a]s BPJ became increasingly concerned about recovery of fees, BPJ showed increasing disdain toward Ms. Lindenberg, ultimately pursuing its

14

own interests above hers on several occasions." (Id.) The Court finds this to be a striking accusation in light of the evidence. Besides taking this position in the Response, Ms. Lindenberg at no time raised any ethical concerns regarding the BPJ lawyers working on her case. In fact, while BPJ litigated and sought mediation on her behalf, it was Ms. Lindenberg who repeatedly expressed a desire for BPJ to stay on as counsel. This is confirmed by multiple emails. (See ECF No. 257-7 at PageID 5331 ("We have always relied on you as the attorney in this case and we continue to do so."); see also ECF No. 257-7 at PageID 5334 ("To be very clear, as we have stated repeatedly, no counsel has been sought on any matters relative to the facts of this case. We have relied solely on you in this matter.") and ECF No. 257-7 at PageID 5336 ("Pat is not giving advice on how we pursue our rights under this case. We only look to you to do so.").)

There is simply no evidence that BPJ did anything short of exceptional advocacy for at least seven years on behalf of Ms. Lindenberg, even when Ms. Glover accepted that she no longer had any expectation of ever being paid. (See, e.g., ECF No. 264-25 at PageID 5756.) After a years-long dispute over fees, it is understandable for both parties to have hard-feelings, but there is simply no evidence to suggest that any such resentment had *any* bearing whatsoever on the sufficiency of representation on behalf of Ms. Lindenberg. Accordingly, the Court rejects Ms. Lindenberg's arguments that BPJ violated any rules of professional conduct and forfeited its right to a lien.

## IV. CONCLUSION

For the reasons stated above, the Court finds that BPJ is entitled to recovery of a reasonable fee for work done following the December 22, 2014 jury verdict. As stated at the hearing held on November 18, 2020, the parties do not dispute the reasonableness of the fee requested. BPJ is awarded the difference of the fees and costs it requested ($369,174.22) and the costs and fees it presented at trial ($198,000) and those which it has already been paid directly by JNL ($11,233.50,

ECF No. 257 at PageID 5301, fn. 1.)  As provided by the calculation in Appendix A, BPJ is awarded $154,042.95 in attorneys' fees and $5,897.77 in costs for a total sum of $159,940.72.  The remaining $209,233.50 held by the Court will be disbursed to Ms. Lindenberg.

It is so **ORDERED**, this 26th day of January, 2021.

/s/ Jon P. McCalla_____
JON P. McCALLA
UNITED STATES DISTRICT JUDGE